# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

*vs.*                              **CRIMINAL ACTION NO.  1:13cr18**

**ERIC SCOTT BARKER,**
**MEGAN EILEEN DUNIGAN, and**
**ROBERT ALLEN HILL,**

        **Defendants.**

## REPORT AND RECOMMENDATION/OPINION

This matter is before the undersigned for consideration of Defendant, Eric Scott Barker's "Motion to Suppress Evidence" [D.E. 14] filed on April 2, 2013, Megan Dunigan's "Motion to Suppress Evidence and to Adopt Motion of Codefendant Barker [D.E. 16] filed on April 5, 2013, Robert Hill's "Motion to Suppress Evidence and to Adopt Motion of Codefendant Barker and Codefendant Megan Dunigan" [D.E.18] filed on April 5, 2013, and Barker's "Second Motion to Suppress Evidence" [D.E. 20] filed April 10, 2013.  The United States filed its "Response in Opposition to Defendants' Motions to Suppress Evidence" [D.E. 21] on April 15, 2013.  The motions were referred to the undersigned United States Magistrate Judge by Orders entered by District Judge Irene M. Keeley [D.E. 15, 17, and 19].

On April 16, 2013, came Defendant Barker, in person, and by counsel, Brian J. Kornbrath, Defendant Dunigan in person and by counsel Roger Curry, Defendant Hill in person and by counsel DeAndra N. Burton,  and the United States by its Assistant United States Attorney, Shawn A. Morgan, for hearing on the motions.  At the conclusion of the hearing, the undersigned permitted the United States to file a supplemental brief, and for Defendant to respond to same.  The United States filed a "Supplemental Memorandum of Law" on April 30, 2013 [D.E. 30].  Defendant Barker, through counsel, filed a Post-Hearing Memorandum on May 7, 2013, which is also considered as

adopted by the other two defendants [D.E. 31]. The Court notes that Defendant Barker also filed a Response, *pro se*, to the United States' Supplemental Memorandum of Law. Defendant Barker has counsel, and counsel has filed a Memorandum. The Court will therefore not entertain Defendant's *pro se* motion as improvidently filed. [1]

## I. Procedural History

Defendants Eric Scott Barker, Megan Dunigan, and Robert Allen Hill were indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on March 5, 2013 [D.E. 1]. The Three- Count Indictment charges Defendants Barker and Dunigan with Conspiracy to Possess with Intent to Distribute Heroin (Count One) and Possession with Intent to Distribute Heroin - - Aiding and Abetting (Count Two); and charges all three defendants with Maintaining a Drug-Involved Premises - - Aiding and Abetting (Count Three). The Indictment also contains a Forfeiture Count.

As a threshold matter, Defendant Dunigan's Motion to Adopt Motion of Codefendant Barker [D.E. 16] and Defendant Hill's Motion to Adopt Motion of Codefendant Barker and Codefendant Megan Dunigan" [D.E.18] are each **GRANTED**.

## II. The Contentions

Defendants contend:

1.  The arrest warrant did not permit officers to enter Barker's residence, because they lacked probable suspicion to believe that Barker was actually present at the time.

2.  The warrantless search of Defendants' residence violated their Fourth Amendment Rights.

3.  By the time the protective sweep occurred, Barker was in custody.

---

[1]Upon cursory review of the motion, there does not appear to be any substantive argument not already covered by counsel's Memorandum.

4.     The use of a trained dog was a warrantless search in violation of Defendants' Fourth Amendment Rights.

5.     The subsequent search warrant was obtained using the illegally obtained evidence and should be suppressed as "fruit of the poisonous tree."

The Government contends:

1.     Reasonable suspicion existed to justify entering Barker's residence to execute the arrest warrant.

2.     Articulable facts justified the warrantless "Protective Sweep" of the residence.

3.     Even if the recent <u>Florida v. Jardines</u> decision invalidates the warrantless search by a certified K9, the officer's request for use of the dog was objectively reasonable.

4.     Even if the use of the K9 is determined to be a warrantless search not saved by <u>Leon</u>, sufficient probable cause still exists on the face of the warrant to justify its issuance.

### III. Threshold Matter–Photographs

As a threshold matter, the Government introduced three photographs material to the motions at issue, to which Defendants objected on the grounds that those photographs should have been disclosed weeks ago and they had not even seen them until this date.  Defendants argued that even if the U.S. Attorney's Office did not itself have the photographs, the Probation Office and Harrison County Drug Task Force Officers who were working in concert with the Federal officers did have them.  The photographs should therefore be deemed collective knowledge which should have been disclosed to Defendants long ago.

Fed.R.Crim.P. 16(a)(1)(E) provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within

the govern's possession, custody, or control and:

(I)     the item is material to preparing the defense;
(ii)    the government intends to use the item in its case-in-chief at trial; or
(iii)   the item was obtained from or belongs to the defendant.

The Federal Rule does not stipulate the time frame for the disclosure.  L.R.Crim.P. 16.01(d)

provides, however:

> Unless the parties agree otherwise, or the Court so orders, within fourteen (14) days
> of the Standard Discovery Request, the government must provide the requested
> material to counsel for the defendant and file with the Clerk a written response to
> each of defendant's requests.

In this Court, and in this particular case, the Court ordered the U.S. Attorney to provide Defendants'

counsel with copies of pretrial discovery and inspection on or before March 27, 2013, one week from

the arraignment. Clearly, under the Court's Order, the disclosure of the photographs,  made on April

17, 2013, was late, if  they were required disclosures under 16(a)(1)(E).

The Government argued that Rule 16(c)  provides the that United States has a continuing

duty to make disclosures before or even during trial.  The U.S. Attorney's Office  did not have the

photos and were not looking for any such photos because it was not aware that the there would be

an issue concerning the vehicle that was asserted to have been driven by Defendant Barker and

present at the address searched.  Only when Barker's <u>Second</u> Motion to Suppress was filed, on April

10, 2013, did the United States recognize there was an issue concerning the vehicle and, to meet the

second prong of <u>Payton v. New York</u>, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639

(1980), interviewed  Deputy United States Marshal Terry Moore and City of Clarksburg Police

Officer Robert Root to ascertain whether the vehicle was parked at the residence at the time of the

arrest.  Although the officers indicated it was, they did not have photographs showing the vehicle.

They remembered, however, that United States Probation Officer Vincent Zummo had been monitoring the building, waiting for the officers to arrive. Officer Zummo was asked if he had taken any photographs of the scene at that time, and responded that he had taken photographs that showed the vehicle in question. Counsel for Defendant again objected to the admission of the photographs, arguing that Officer Zummo was at the scene as part of the team serving the arrest warrant, and therefore the photographs were, again, collective knowledge which should have been disclosed to the defense.

The undersigned advised that he would allow the photographs to be shown provisionally for purposes of the hearing, but withhold ruling on their admission.

Upon review, the undersigned finds the photographs identified as Government Exhibits 1, 2, and 3 are admissible over the objections of the Defendants. The photographs were taken by Probation Officer Zummo as he monitored the residence for the purpose of determining whether his supervisee, Barker, was present. There is no evidence that anyone was at the location for anything other than the apprehension of an individual who had allegedly violated his conditions of supervised release and was, in effect, a fugitive. Only after the law enforcement officers located the three convicted felons in the apartment, along with evidence of drugs in plain view, was there any indication there may be a separate criminal case.

Even after the Indictment, the undersigned does not find the photographs of the vehicle were material to preparation of the defense. The Government asserts, and the undersigned believes, it had no intention of using them in its case-in-chief. In fact, the Government asserts it did not even know the photos existed. Finally, Defendants cannot possibly assert the photos were obtained from them. Barker denies even driving the vehicle.

The Government's need to determine what evidence it had of the vehicle being parked at the apartment only became apparent after the Motions to Suppress were filed. In fact, it was not until Defendant Barker's Second Motion to Suppress, filed April 10, 2013, that he argued for the first time that the police lacked reasonable suspicion to believe Barker was actually present in the residence. It was in that late-filed motion that Defendant asserted that "no vehicle was parked outside the residence at that time which would link the defendant to the residence." According to the representation of the AUSA, it was at that point that she began inquiring of the different officers whether the vehicle was parked at the residence.

More importantly, even if the photographs had been required disclosures, and even if they were late, there is no prejudice to the defendants' preparation for trial, especially because the parties moved for and were granted a continuance of at least thirty (30) days.

The undersigned therefore finds Government Exhibits 1, 2, and 3 admissible at least for the purposes of the hearing on Defendants' Motions to Suppress.

### IV. Testimony and Evidence

The Court heard the testimony of Deputy United States Marshal Terry Moore, City of Clarksburg Police Officer Robert Root, and of Defendant Barker. The Court also admitted Government Exhibit 1, a photo of the residence, Government Exhibits 2 and 3, photos of a silver-tan Ford Contour, Government Exhibit 4, a not-to-scale diagram of the layout of the apartment, and Government Exhibit 5, the search warrant affidavit.

DUSM Moore testified that as part of his assignments he coordinates warrants that come into the U.S. Marshal's office. He was responsible for the February 8, 2013, arrest warrant. He received a copy of it by email and also received a phone call from Defendant Barker's supervising United

States Probation Officer Vincent Zummo. An arrest warrant had been issued by the Court for Defendant Barker's arrest for violations of conditions of supervised release, including the assertion that Defendant had left his approved residence and his whereabouts were unknown. At the time Officer Zummo called he was watching the residence where he believed Barker was. DUSM Moore identified Barker in open court.

DUSM Moore assembled an arrest team and advised them of the history of the case and Defendant. They had met approximately 30 minutes before arriving at the house. Among the assembled team members were Deputy Marshals Derrick Patrick, Phil Efaw, and Fred Frederick, Task Force Officers Robert Root, Mike Fazzini, Chip Sylvester, and Mark Rogers, and United States Probation Officer Zummo and Chief United States Probation Officer Jeff Givens. He testified they had reason to believe Barker resided in that house. DUSM Moore testified he had received information about the residence, and the vehicle Barker had driven there. Deputy Moore had no personal knowledge that the vehicle was there – that information came through Officer Zummo. He also had no basis to know that Dunigan or Hill was present. The team went to the 1000 block of Philippi Pike, to a two-story yellow house with red shutters. The officers believed the house was a singular residence.

The officers were all in uniform, tactical gear. DUSM Moore testified that he knocked on the door of the house, and an older lady answered. She appeared frightened. They told her they had an arrest warrant for Eric Barker, and she said, "Eric lives up there" and that "she thought he was home." Upon cross examination, Deputy Moore agreed he had not included the information that the landlady had said that she thought Barker was home in his report. He was "pretty confident" she had said that, but it was in no report. DUSM Moore testified that prior to going upstairs, he looked at

the top floor of the residence, and saw a window curtain "nudged to the side as if someone was looking." He was just off the porch where he could see the windows. Government Exhibit 1, showing the exterior of the house, was admitted. He testified that the middle of the three windows was the one in which he had seen the curtain move. From Exhibit 4, the diagram of the apartment, he indicated that window would have been at the end of the open hallway on the second floor, looking out at the street. He did not recall if the curtain was a single curtain moved to the side or double curtains moved from the center. He did not see a face or fingers.

He also identified Government Exhibit 2 as a photo of the car Barker had previously been seen driving, and Government Exhibit 3 as a photo of the license plate of that vehicle, which was registered to Barker's father. All three exhibits were admitted over Defendants' objection.

DUSM Moore testified that once the officers opened the door that led to the upstairs apartment, they were faced with a flight of stairs. They went up the stairs in a line, with the officer in front carrying a shield. When they got to the top of the stairs they were in a narrow hallway with a closed door directly in front of them, a closed door immediately to the left of that door, and an open kitchen area to the right. The Court admitted Government Exhibit 4, a diagram of the layout of the apartment, not to scale. DUSM Moore testified he opened the bathroom door and saw Barker. He ordered Barker to lie down, and then handcuffed him. Barker did not fight and was not threatening. Officers tried to open the door immediately to the left of the bathroom (when facing the doors), but it was locked. That door was no more than a step or two from the bathroom where Barker had just been found. That the door was locked seemed unusual, since the only person the officers had believed to be in the residence was in the bathroom. "The person we believed to be in the house was not in that room and yet it was locked." The officers were in a narrow hallway at the top of a flight

of stairs. Deputy Moore handcuffed Barker before the second door was opened. The door was kicked open and the officers found Defendant Dunigan inside. Deputy Moore observed pills laying on the dresser. On cross-examination, he stated he was unsure whether what he observed was pills or another substance, but it "struck him" as a controlled substance based on his experience and training as well as on Barker's history of drug abuse and distribution. He also heard another officer state: "One other in custody." He later found out that other person was Defendant Hill. Deputy Moore testified the entire protective sweep took perhaps a minute to 2 ½ minutes.

Deputy Moore testified that the entire area in which the officers were assembled was small and very unprotected. Once up the stairs, they were exposed to any area of the house. The officers followed regular protocol for a protective sweep, even though they did not have knowledge anyone besides Barker was in the residence. The bathroom was opened first, but even after locating Barker, they would have continued the protective sweep search. The area was so open and so confined that "a threat could have come from anywhere."

Probation Officer Zummo was not part of the arrest team. He was directed, along with Chief Probation Officer Givens to remain downstairs with the landlady. The officers upstairs had no reason to believe Dunigan or Hill were in the residence, but had reason to believe Barker was. DUSM Moore recognized that Dunigan was on Federal Supervised Release, as he had been involved in her prior arrest. Officer Zummo later recognized and identified both Dunigan and Hill as being on Federal Supervised Release. Deputy Moore identified both Dunigan and Hill in open court. Once Officer Zummo recognized the other two Federal Supervisees, the undersigned United States Magistrate Judge was contacted regarding the two being in violation of their conditions of supervised release. Both were also arrested.

9

USDM Moore testified Barker was very anxious about $1,000.00 he had on his person. The United States Marshal Service took all three defendants to Court. Deputy Moore was not involved in the subsequent drug dog sniff or obtaining a search warrant. He did see items in plain view, including a hypodermic needle in the bathroom in which Barker was found and pills on the dresser in which Dunigan was found. He also saw a package for synthetic marijuana in the open kitchen area. He believed the team was on the property for approximately 15 minutes.

Upon inquiry by the Court, Deputy Moore testified he had relied on the information from Probation Officer Zummo, and that this was standard protocol when searching for and apprehending a supervised releasee. It was through his discussions with Officer Zummo that he gained the information about the silvery tan Ford Contour Barker had been seen driving during a previous controlled purchase. He did include looking for the Ford Contour in his report.

Officer Root testified that on January 29, 2013, a controlled purchase of crack cocaine was arranged through a confidential informant. The confidential informant was driven to the area of the buy by Barker in the Four Contour already described. The vehicle arrived. The registration came back to Barker's father, Randall Barker. Task Force Commander Brian Purkey advised Officer Root that he knew Randall Barker and had previously arrested Eric Barker. Lt. Purkey received a phone call regarding where Barker might be. Officer Root drove by the location and saw the vehicle he had seen at the controlled buy. He had driven by due to his knowledge there was a warrant for Barker's arrest from either the Probation Office or the Marshals Service. He had no plan to obtain a search warrant. He received a call from Deputy Moore requesting manpower and assistance in the arrest. He contacted Officers Rogers, Fazzini, and Sylvester.

Officer Root was shown Government Exhibits 1, 2, and 3, and testified the first was a photo

that fairly and accurately depicted the residence where Barker was arrested, the second was a photo

of the vehicle registered to Randall Barker that Eric Barker had been seen driving, and the third was

a photo of the license plate for that vehicle. He testified those photos had been taken by Probation

Officer Zummo on February 8.

Officer Root met up with the other officers who formed the "team" to execute the arrest

warrant for Barker. Officer Zummo was parked outside the residence on the road, and was not

involved in entering the house. The officers approached the house and knocked. Deputy Moore

announced that he saw curtains moving upstairs. Officer Root testified he believed at the time they

entered that Barker would be in the residence. A woman answered the door and they entered and

talked to her. All he heard of the conversation with her was: "We're looking for Eric Barker." He

saw her point toward the door. They entered and went up the stairs. They located Barker in the

bathroom. He had a homemade tourniquet around his arm. When asked how he knew it was a

tourniquet and not an accessory such as a tribal bracelet, Officer Root testified it appeared to be a

belt. Once Barker was taken into custody and the bedroom immediately adjacent was entered, he

went to the other bedroom, made entry, and found Hill. Officer Root was shown Exhibit 4, the

diagram of the residence. He said it took from only seconds to at most two minutes to get from the

top of the stairs to Hill. There was no delay. He was looking for people – threats – "people that

could hurt us." He identified Barker, Hill, and Dunigan in Court.

Officer Root testified he saw "lots of paraphernalia," including packaging materials in the

open living room and scales. After all three defendants were secured and the protective sweep was

done, Officer Zummo came upstairs. He identified the defendants. He observed that all three were

on federal supervised release. He looked through where the three had been arrested and asked the

officers to also walk through to see if anything was in plain view. They saw evidence, including needles, paraphernalia, and drugs in plain view. Officer Zummo grabbed items that were on top of the bathroom sink, including an "IV drug use kit" and cell phones. Nothing else was seized until after the search warrant was obtained.

Officer Zummo had the K9 unit come upstairs. The dog was on a leash and was being handled by Clarksburg Police Officer Quinn, because it was cross-trained and could bite. Officer Root saw "lots of paraphernalia and drug evidence, including a package of synthetic marijuana." The dog alerted up high, leading the officers to look at the ceiling. They noted a ceiling tile had been moved. After seeing the drug evidence and after the dog alerted, Officer Root went to obtain a search warrant.

On cross examination, Officer Root conceded that his report regarding the controlled purchase on January 29th, stated only that the CI was driven to the sale by a white male subject in a car owned by Barker's father. The report did not mention Barker by name. Neither he nor anyone else personally saw Eric Barker driving the car, they just noted seeing a white male subject driving Barker's father's car. He did not know if Randall Barker provided the car to anyone else besides Eric Barker to drive. The information that Randall Barker was related to Eric Barker was provided to Officer Root by Lt. Purkey.

Officer Root identified Government Exhibit 5 as the search warrant affidavit he completed. Paragraphs 5 and 6 of the affidavit deal with the drug dog.

The Court took judicial notice of Barker's terms of Supervised Release, signed by him on November 30, 2012, which includes the Standard Condition of Supervision:

10) the defendant shall permit a probation officer to visit him or her at any time at

home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

Defendant Barker testified that on February 8, 2013, he had not "permitted" Probation Officer Zummo to visit at his home. He did not "permit" Officer Zummo to confiscate any items. Officer Zummo never asked for "permission" to enter his home or to confiscate any items. On cross-examination, Barker admitted he was not living at his approved residence and had not told Officer Zummo where he was living so that he <u>could</u> ask permission, even if he needed it.

### V. Motion to Suppress

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." <u>United States v. Wilhelm</u>, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) <u>quoting</u> <u>United States v. United States District Court</u>, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." <u>Silverman v. United States</u>, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." There is probable cause to search a home if there is a fair probability that evidence of a crime is located within the residence. <u>See</u> <u>United States v. Murphy</u>, 241 F.3d 447, 457 (6th Cir.

2001).  Whether probable cause exists must be determined "under the totality of the circumstances."

See Illinois v. Gates, 462 U.S. 213 (1983).

## a.  Standing

As a threshold matter, Defendant Barker asserts he was a lawful resident of the apartment located at 1103 Philippi Pike in Clarksburg, West Virginia, and therefore has legal standing to press his claim.  Defendant Dunigan asserts that at all relevant times herein, she was a lawful resident of the apartment located at 1103 Philippi Pike in Clarksburg, West Virginia, such that she had an expectation of privacy in that residence and a legal standing to press this claim.  Defendant Hill asserts that on February 8, 2013, he had been an overnight visitor at the apartment located at 1103 Philippi Pike in Clarksburg, West Virginia, such that he had an expectation of privacy in that residence, and that, as a result, he also has legal standing to press this claim.

The United States concedes there is no issue of standing related to any of the defendants' motions and that they all have standing to press their claims.

## b.  The Arrest Warrant

There is no dispute that there was no search warrant for Defendant Barker's residence and no warrants for Dunigan or Hill at the time of the entry.  There is also no dispute, however, that there was a valid warrant for Barker's arrest.  Barker was under federal supervision following his revocation of previous supervised release.  His current term of supervised release began on November 29, 2012.  On February 8, 2013, Barker's supervising Probation Officer filed a Petition with the Court advising that Barker had tested positive for cocaine, codeine, morphine, and hydrocodone on January 28, 2013; had left his approved residence without permission; failed to report for drug testing on February 1, 2013; and failed  to submit a written report for January 2013.

14

His whereabouts were unknown.  A warrant for his arrest was issued that same date.[2]  There is

therefore no doubt that there was a valid arrest warrant for Barker.

> If there is sufficient evidence of a citizen's participation in a felony
> to persuade a judicial officer that his arrest is justified, it is
> constitutionally reasonable to require him to open his doors to the
> officers of the law.  Thus, for Fourth Amendment purposes, an arrest
> warrant founded on probable cause implicitly carries with it the
> limited authority to enter a dwelling in which the suspect lives when
> there is reason to  believe the suspect is within.

Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371 (1980).  The Government argues and Defendant

concedes that the police had reason to believe that Barker lived at the address at which he was

arrested.  The police received a tip that he lived at the apartment.  Police observed a vehicle

registered to Defendant's father parked at that residence ten days earlier.  The landlady told the

officers "Eric lives upstairs."  The undersigned finds the first prong of Payton is met.

 Barker, in his second motion to suppress, however, argues that the police "lacked reasonable

suspicion to believe [he] was actually present in the residence before they entered.  He contends no

vehicle was parked outside the residence at that time which would link him tho the residence, and

that the landlord's "terse response" that "Eric lives upstairs" did not indicate to them that he was

actually at home and physically present that very moment.

The United States argues that the fact that the police were aware Defendant was residing at

the address, plus the fact that the landlord stated: "Eric lives upstairs," plus the fact that one officer

---

[2]On February 12, 2013, Barker's supervising Probation Officer filed an Amended
Petition,  alleging, in addition to the previous violations, that Defendant had been arrested
pursuant to the previous warrant.  The new allegations are based on the arrest and the evidence
that forms the basis also for the new Indictment and, in turn, the motions to suppress.

saw curtains moving upstairs, plus the fact that the vehicle Barker had been seen driving was parked at the residence, gave the police reason to believe he was within. Defendant counters that the sight of the curtain moving after their presence was announced, was insufficient to establish that they had reason to believe he was within, citing Allen v. Gillenwater, 2012 WL 3475583 (M.D.N.C. 2012). Allen, an unpublished case from another district, is distinguishable in several significant ways, however. Although before going to prison Allen had lived with his mother in her apartment, and despite Allen's driver's license giving her apartment as his address, the apartment belonged to his mother, a Ms. Jones. The officers knocked on Ms. Jones's door and no one answered. They then obtained a key from an apartment complex employee and entered the residence. No one was home. As the M.D.N.C. first stated: "[a]n arrest warrant does not authorize law enforcement to enter the home of a third person to execute it, even if the defendant is present, absent consent or exigent circumstances."(citing Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (emphasis added)). The police contended there were exigent circumstances after they saw "porch blinds suddenly beg[i]n to move inside Ms. Jones's apartment." The court stated, in dicta, that the movement of the blinds was not evidence that Allen was within the home:

> Moving blinds may not be indicative of any human activity at all, it can be caused by the heating system or a draft or a pet, to list only a few of the possibilities. Moreover, moving blinds give officers no indication that Mr. Allen was within, rather than Ms. Jones or any other person. Generalized suspicions do not establish probable cause or a reasonable belief. Finally, while the officers believed that the moving blinds indicated Mr. Allen's presence, their subjective beliefs are not relevant.

Even if Allen were precedential in this district, the differences between Allen and the case before this court are many. First, the residence was believed to be Barker's, not some third party's. Second, the landlady corroborated that fact, and said, "Eric lives upstairs." At least one officer

testified he believed the landlady said he was present. The police did not enter a third-party's home to search for Barker, they knocked on a third-party's door, and she answered it and showed the police where "Eric" lived. The officer seeing the curtains moving is simply more evidence that Barker was in his own residence. Although it is possible the movement of the curtains was not caused by a person, the only person the officers believed to be in the apartment was Barker. The officer testified the curtains appeared to have been moved to the side as if to see out. The officers then went to Barker's residence– not a third party's. When the officers got to the top of the stairs they saw a locked bathroom with a light on inside. It was reasonable to assume that Barker was inside.

The undersigned finds the "entry" into Defendant's apartment to effect an arrest warrant did not violate Defendants' Fourth Amendment rights.

**c. The Warrantless Search**

There is no dispute there was no search warrant. After arresting Barker, the police performed what they called a protective sweep search of his apartment. All three defendants argue this search violated their Fourth Amendment rights because there was no search warrant, there was no probable cause, there was no reasonable suspicion, and there was no exigency. The police entered "each and every room of defendant's residence during the protective sweep." Co-defendants Hill and Dunigan were found inside separate bedrooms in the apartment. According to the testimony, numerous articles associated with drug paraphernalia and drug usage were also found in plain view.

Protective sweep searches of buildings incident to the arrest of persons in or immediately outside a dwelling or building are permissible to protect the safety of the arresting police officers. See, e.g., Maryland v. Buie, 484 U.S. 325, 334 (1990); Mincey v. Arizona, 437 U.S. 385 (1978); U.S. v. Cephas, 254 F.3d 488 (4th Cir. 2001); U.S. v. Guinn, 2319 F.3d 326) (4th Cir.) cert. denied,

531 U.S. 1025(2000); <u>U.S. v. Bernard</u>, 757 F.2d 1439 (4th Cir. 1985); and <u>U.S. v. Baker</u>, 577 F.2d 1147 (4th Cir. 1978).

It is not significant that Barker was arrested prior to and outside of the rooms that were entered incident to the protective sweep. In <u>Jones</u>, <u>supra</u>, the Fourth Circuit expressly stated in a footnote that a protective sweep applies to an arrest even if it takes place completely outside the residence:

> [A]n arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home." *See United States v. Lawlor*, 406 F.3d 37, 41(1st Cir. 2005). We have heretofore implicitly approved of such reasoning, *see United States v. Green*, 599 F.3d 360, 376 n. 16 (4th Cir. 2010), and are satisfied to do so more explicitly here.

<u>Jones</u>, <u>supra</u>, at n. 10.

Defendants argue that <u>Buie</u> limits protective sweep searches to those occasions when the police have "articulable facts which taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." <u>Buie</u>, <u>supra</u> at 334. In <u>U.S. v. Colbert</u>, 76 F.3d 733 (6th Cir. 1996) the Sixth Circuit stated:

> Lack of information cannot provide an articulable basis upon which to justify a protective sweep . . . [A]llowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court's explicit demand in *Buie* that the police have an articulable basis on which to support their reasonable suspicion of danger inside the home.

Defendants here argue that the police had a reasonable basis to conclude that only Barker would be present when they effected his arrest. The information that Barker lived at the residence was consistent with the curtain moving upstairs. There was no information upon which to establish reasonable suspicion that others were in the residence who might pose a danger. There was,

however, the fact that the officer saw the upstairs curtain move, and that that curtain was in the front of the house, not in the back where Barker was found. There was also the fact that at least one officer testified he found suspicious. If Barker was the only person in the apartment, and he was in the bathroom, why was the door next to the bathroom locked?

There is no dispute that there were no warrants out for either Dunigan or Hill. They argue that by the time the protective sweep occurred, Barker was in custody, which was the point of the authorities' presence.

Even Dunigan concedes, however, that there was a possibility that the citizen in the first floor apartment or neighbors in other residences could have constituted some danger to the officers.

In <u>Jones v. United States</u>, 667 F.3d 477 (4th Cir. 2012), the Fourth Circuit dealt with a similar search. Officers went to the Jones residence to question the Joneses regarding an investigation of a burn victim's injuries they were informed were possibly due to a meth lab explosion. Mr. Jones informed the officers he knew nothing of the burn victim or a meth lab and asked them to leave his property, which they did. At that point one officer recalled, then confirmed, that Mr. Jones was the subject of an outstanding arrest warrant. The officers returned to the residence to arrest Mr. Jones. They found him in the open doorway of the residence, informed him of the warrant, and placed him under arrest. As one officer was placing Mr. Jones in handcuffs, the other officers entered the house through the front door with their handguns drawn. The officers announced they were going to conduct a protective sweep of the residence for the officers' safety. They asked the Joneses if anyone else was in the house and they replied there was not. No movement was seen from within the house to indicate the presence of any other person and there was no indication of illegal drug activity. The officer was nevertheless suspicious that others might be in the house, "based primarily on his prior dealing with the Joneses, whom he had investigated at various times since 2003 as part of his duties

as a narcotics officer."

During the protective sweep, the Joneses remained in the living room. The officers quickly scanned the remaining rooms but found no one else in the house. They did, however, notice a number of items in plain view which they believed constituted precursor materials for the manufacture of meth and detected a strong odor associated with meth production. They also found marijuana. They arrested Mrs. Jones for possession of marijuana. The officers then applied for and obtained a search warrant.

Both defendants moved to suppress the items found in the warrantless search, on the same basis as Defendants do here: That the authorities did not possess a sufficient factual basis for a reasonable suspicion that there were other individuals in their residence who could pose a danger to the officers in connection with their arrest of Mr. Jones.

The Fourth Circuit discussed the argument as follows:

First, the authorities are entitled to search "incident to the arrest . . . as a precautionary matter and without probable cause or reasonable suspicion, . . . closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." _Buie_, 494 U.S. at 334, 110 S.Ct. 1093. Second, the officers are entitled to perform a further "protective sweep," beyond the immediately adjoining areas, when they have "articulable facts which, taken together with the rational inferences from which those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." _Id._ Such a protective sweep is circumscribed, however, extending "only to a cursory inspection of those spaces where a person may be found, and lasting" "no longer than it takes to complete the arrest and depart the premises." _Id._ at 335-36, 110 S.Ct. 1093.

The Fourth Circuit continued:

[T]he exigent circumstances exception to the warrant requirement is not at issue. Nor is it relevant that the Joneses were relatively temperate during the first encounter with the officers, and even during the arrest of [Mr.] Jones. The linchpin of the protective sweep analysis is not "the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by hidden third parties in the house." _See_ _Buie_, 494 U.S. at 336, 110 S.Ct. (1093). In that regard the fact that the officers had

safely exited the front porch after the brief first encounter - - when there had been no arrest or provocation - - is not determinative. The question is whether there was a reasonable basis for the officers to believe that there could be other individuals in the residence who might resort to violence when incited by their confederate's arrest during the second encounter.

The Joneses nevertheless persist that the officers were acting on no more than a "mere inchoate and unparticularized suspicion or hunch" that other dangerous individuals were lurking in their residence, in that such a suspicion or hunch would not support a warrantless protective sweep. . . . We also recognize, as certain other courts have recognized, that a "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." _United States v. Colbert_, 76 F.3d 773, 778 (6th Cir. 1996); _accord United States v. Moran Vargas_, 376 F.3d 112, 117 (2d Cir. 2004); _United States v. Chaves_, 169 F.3d 687, 692 (11th Cir. 1999). Otherwise, "allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep. _Colbert_, 76 F.3d at 778. We are not, in this case, confronted with a situation where there was some lack of information. The district court concluded that there were specific articulable facts underlying the officers' suspicions that other dangerous individuals could be in the Jones residence.

The undersigned finds, in this case, there were "articulable facts which taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, supra at 334. There was the fact that the officer saw the upstairs curtain move, and that that curtain was in the front of the house, not in the back where Barker was found. There was also the fact that Barker was found in the bathroom, but the adjacent door was locked. The officers were in a confined area, having come straight up a flight of stairs and into a narrow hallway.

Based on all of the above, the undersigned finds the protective sweep search was justified.

**d. The Drug Dog**

According to the Motions and testimony, after the defendants were arrested, and after the protective sweep was conducted, because police observed drug paraphernalia in plain view, a decision was made to conduct a search of Barker's residence with a trained police narcotics dog.

The decision to call in the K9 unit was made by Probation Officer Vincent Zummo. The dog was brought into the apartment where it "showed interest" in a particular area up high. The police looked toward that area with a flashlight and it appeared that a ceiling tile had been moved. According to the motion, the police then applied for and obtained a search warrant based on the items seen in plain view during the arrest and protective sweep and the warrantless drug dog search. The defendants therefore argue the search warrant itself is invalid as based on illegally-obtained evidence.

In the very recent case <u>Florida v. Jardines</u>, - - - S.Ct. - - -, 2013 WL 1196577 (U.S. Fla.), the United States Supreme Court held that officers' use of a drug-sniffing dog on the front porch of a home, to investigate an unverified tip that marijuana was being grown in the home, was a trespassory invasion of the curtilage which constituted a "search" for Fourth Amendment purposes.

This case is distinguishable from <u>Jardines</u>, in that this case involves an individual on federal supervised release. The dog was not outside the residence, but was actually brought inside the residence after drug paraphernalia was found in plain view, and after the protective sweep pursuant to which two other federal supervisees were found. The K9 unit was directed to assist in the search by Defendant Barker's supervising Probation Officer.

In <u>United States v. Knights</u>, 534 U.S. 112 (2001), the United States Supreme Court concluded that a warrantless search of a probationer was "reasonable" based on "the totality of the circumstances." As the Court explained in its conclusion:

> Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable . . . When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

Knights is distinguishable from the case at bar in one respect, however. In Knights, the probationer's conditions of release included his agreement to:

> Submit his . . . person, property, place of residence, vehicle, [and] personal effects to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer.

Id. at 114. (Emphasis added). Barker's condition is slightly different, stating:

> [T]he defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

(Emphasis added). Defendant argues he did not permit the search and was not even asked to permit the search. Further, he argues that if he refused to permit the search, although he would be in violation of his conditions, a search without permission would still be unconstitutional.

Regardless of the wording of the conditions of release, the undersigned does find Barker, a convicted felon on supervised release, had "a significantly diminished privacy interest." The undersigned further finds that locating Barker in a locked bathroom with needles in plain view and a tourniquet around his arm provided a reasonable suspicion that he was engaged in criminal activity.

Further, in Davis v. United States, 131 S.Ct. 2419 (2011) the United States Supreme Court held that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule. Prior to the decision in Jardines, the use of a drug dog was not even considered a "search" under Fourth Circuit precedent. See United States v. Jeffus, 22 F.3d 554 (4th Cir. 1994)(use of drug dog not itself a "search," but fact that drug dog "alerts" constitutes probable cause to search). The Davis Court stated:

> Responsible law enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. Hudson, 547 U.S., at 599, 126 S.Ct. 2159. But by the same token, when binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and

public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does not more than "'ac[t] as a reasonable officer would and should act'" under the circumstances. _Leon_, 468 U.S., at 920, 104 S.Ct. 3405 (quoting _Stone_, 428 U.S. at 539-40, 96 S.Ct. 3037 (White, J., dissenting)). The deterrent effect of exclusion in such a case can only be to discourage the officer from "'[d]oing' his duty.'" 468 U.S., at 920, 104 S.Ct. 3405.

That is not the kind of deterrence the exclusionary rule seeks to foster. We have stated before, and we reaffirm today, that the harsh sanction of exclusion "should not be applied to deter objectively reasonable law enforcement activity." _Id._, at 919, 104 S.Ct. 3405. Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

The Court concluded:

It is one thing for the criminal "to go free because the constable has blundered." _People v. Defore_, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926)(Cardozo, J.). It is quite another to set the criminal free because the constable has scrupulously adhered to governing law. Excluding evidence in such cases deters no police misconduct and imposes substantial social costs. We therefore hold that when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply.

**e. The Search Warrant**

Even if the K9 sniff were found to be an unconstitutional search after Jardines, and even in the unlikely case the evidence was found to be excludable, the undersigned finds probable cause still supports the issuance of the search warrant. Where inaccurate, improper or otherwise tainted evidence is used to obtain a search warrant, this fact will not invalidate the search warrant so long as there is enough untainted information to support probable cause. See, e.g., U.S. v. Allen, 631 F.3d 660 (4th Cir. 2011); U.S. v. Wright, 991 F.2d 1182 (4th Cir. 1993); U.S. v. Gillenwaters, 890 F.2d 679 (4th Cir. 1999); and U.S. v. Hawkins, 788 F.2d 200 (4th Cir. 1986).

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213 (1983). However, "probable cause is a fluid concept - - turning on the assessment of probabilities in particular factual context - - not readily, or even usefully, reduced to a neat set of

legal rules." Id. at 232.  The probable cause standard does not:

> [R]equire officials to possess an airtight case before taking action.  The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

Taylor v. Farmer, 13 F.3d 117 (4th Cir. 1993).  Accord Ornelas v. United States, 517 U.S. 690 (1996)

(Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of

reasonable prudence in the belief that contraband or evidence of a crime will be found.")

In this case, removing paragraphs 5 and 6, regarding the drug dog sniff, leaves the following

in support of the warrant:

> 3. . . . . A continued protective sweep for other occupants of the apartment revealed a white female and a white male, who were encountered hiding in separate bedrooms.

> 4.  United States Probation Officer (USPO) Vincent Zummo entered the residence and identified BARKER and the other occupants - - Robert Hill and Megan Dunigan - - as individuals subject to federal supervised release and under USPO supervision.  A search of BARKER's person revealed approximately $1,300.00 in U.S. Currency in BARKER's pants pocket.  A brief search of the area where BARKER, Hill, and Dunigan were found revealed numerous articles of drug paraphernalia, including but not limited to, capped and uncapped syringes, cotton balls, burnt spoons with white reside, homemade tourniquets and digital scales.  All items recovered were in plain view, with a large amount of needles observed on the back of the bathroom sink.

The undersigned finds the above paragraphs support a finding of probable cause to support

the issuance of the search warrant in this case.  Further, under the "inevitable discovery" doctrine,

improperly seized evidence may nevertheless be admitted if the information ultimately or inevitably

would have been discovered by lawful means.  Nix v. Williams, 467 U.S. 431 (1984).  Because the

undersigned finds there was probable cause to issue the search warrant, the drugs hidden in the

ceiling would inevitably have been discovered pursuant to the warranted search.

**f. Leon**

Should the District Court find that the affidavits, even once excised of the information obtained from the use of the drug dog, are insufficient even under the totality of the circumstances, to support a probable cause determination, the government argues that the evidence obtained in the execution of the warrant is saved from suppression under the "good faith" exception to the exclusionary rule announced in United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). In Leon, the Supreme Court recognized "a good-faith exception to searches conducted pursuant to warrants." Id. at 924, 104 S. Ct. 3405, 3421. The officers, affiants, and issuing magistrate judge did not have the benefit of the Supreme Court's holding in Jardines, that the use of a K9 Unit constitutes a search under the Fourth Amendment, because the warrant here was issued prior to the very recent Jardines decision. "Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." United States v. Lalor, 996 F.2d 1578 (4ᵗʰ Cir. 1993)(quoting Leon.) Put another way, the good faith exception applies unless "a reasonably well-trained officer . . . [should] have known that the search was illegal despite the magistrate's authorization." Leon, supra at 922.

The good faith exception does not apply where officers have conducted an unlawful warrantless search prior to obtaining a search warrant, United States v. Mowatt, 513 F.3d 395 (4ᵗʰ Cir. 2008). The good faith exception does apply, however, to certain warrantless searches. See, e.g., Davis v. United States, 131 S.Ct. 2419 (2011)(good faith exception applied to "searches concluded in objectively reasonable reliance on [then] binding appellate precedent;" United States v. Wilks,

647 F.3d 520( 4ᵗʰ Cir. 2011)(search incident to arrest which was lawful when it occurred, but which Supreme Court subsequently held unconstitutional.)  As the Fourth Circuit recognized in <u>Wilks</u>, "evidence seized in a manner consistent with binding precedent at the time it is seized is not subject to suppression should the law change between seizure and prosecution."

As already discussed, prior to the decision in <u>Jardines</u>, the use of a drug dog was not even considered a "search" under Fourth Circuit precedent.  <u>See</u> <u>United States v. Jeffus</u>, 22 F.3d 554 (4ᵗʰ Cir. 1994)(use of drug dog not itself a "search," but fact that drug dog "alerts" constitutes probable cause to search). In <u>Davis v. United States</u>, 131 S.Ct. 2419 (2011) the United States Supreme Court held that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.

Therefore, the question whether the officers reasonably relied on the undersigned United States Magistrate's issuance of the search warrant must be answered in the affirmative."Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." <u>United States v. Lalor</u>, 996 F.2d 1578 (4ᵗʰ Cir. 1993)(quoting <u>Leon</u>.)  Put another way, the good faith exception applies unless "a reasonably well-trained officer . . . [should] have known that the search was illegal despite the magistrate's authorization."  <u>Leon</u>, <u>supra</u> at 922.

There is no evidence Officer Root was dishonest or reckless in preparing the affidavit.  He included the evidence of the dog alert.  Had he been attempting to be dishonest, and knew the dog sniff was unconstitutional he would likely have omitted it.  The undersigned finds the officers reasonably relied on the search warrant.

For all the above reasons, the undersigned United States Magistrate Judge finds that none of the evidence seized from the protective sweep search, the dog sniff or pursuant to the warrant is excludable.

## RECOMMENDATION

For the reasons herein stated, it is **RECOMMENDED** that Defendants' Motions to Suppress Evidence [D.E. 14, 16, and 18] and "Second Motion to Suppress Evidence" [D.E. 20] all be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins**,** 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to direct this Report and Recommendation to counsel of record.

Respectfully submitted this 10th day of May, 2013.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE