# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

        Plaintiff,

V.                            CRIMINAL NO. 1:13CR18
                                        Judge Keeley

ERIC SCOTT BARKER,
MEGAN EILEEN DUNIGAN, and
ROBERT ALLEN HILL,

        Defendants.

## ORDER ADOPTING REPORT AND RECOMMENDATION

Before the Court are the two motions filed by the defendant, Eric Barker ("Barker"), to suppress evidence recovered from his residence. (Dkt. Nos. 14 and 20). Also pending are the motions of Barker's co-defendants, Megan Eileen Dunigan ("Dunigan") and Robert Allen Hill ("Hill"), to suppress evidence recovered from Barker's apartment.[1] (Dkt. Nos. 16 and 18). For the reasons that follow, the Court adopts the magistrate judge's Report and Recommendation ("R&R") and denies the pending motions. (Dkt. Nos. 14, 16, 18, and 20).

---

[1] Barker first moved to suppress certain evidence on April 2, 2013 (dkt. no. 14). Co-defendants Dunigan and Hill ("Hill") moved to adopt Barker's motion on April 5, 2013. (Dkt. Nos. 16 and 18). Hill and Dunigan's motions to suppress repeat the arguments made by Barker. Then, on April 10, 2013, Barker made a second motion to suppress, which Dunigan and Hill did not join. (Dkt. No. 20).

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

**I.**

On March 5, 2013, a grand jury indicted Barker, Dunigan, and Hill on one count of Conspiracy with Intent to Distribute Heroin, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C) (Barker and Dunigan), one count of Possession With Intent to Distribute Herion – Aiding and Abetting, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 (Barker and Dunigan), and one count of Maintaining Drug-Involved Premises – Aiding and Abetting, in violation of 21 U.S.C. § 856(a)(2) and 18 U.S.C. § 2 (Barker, Dunigan and Hill). On April 2, 2013, Barker filed a motion to suppress drugs, drug paraphernalia, United States currency, and cellular telephones discovered in his home on February 8, 2013. (Dkt. No. 14). Dunigan and Hill then followed suit with their own motions to suppress those items and also moved to join in Barker's motion.[2] Barker then filed a second motion to suppress in which he argued that law enforcement had improperly executed a warrant for his arrest by entering his home absent a reasonable suspicion that he, Barker, was in fact in his residence at the time. He also

---

[2]     The United States concedes that Dunigan, who claims to have lived with Barker, and Hill, who stated he was Barker's overnight guest, have standing to assert their Fourth Amendment rights. See Alderman v. United States, 34 U.S. 165, 157 (1969); see also (Dkt. No. 34 at 14).

## MEMORANDUM OPINION AND ORDER
## ADOPTING REPORT AND RECOMMENDATIONS

sought to have all evidence of criminal activity seized from his home suppressed.

Pursuant to 28 U.S.C. § 636, the Court referred these motions to the Honorable John S. Kaull, United States Magistrate Judge, who conducted a suppression hearing on April 16, 2013. (Dkt. No. 22). On April 13, 2013, Magistrate Judge Kaull entered his R&R recommending that the Court deny both of Barker's motions, as well as those of Dunigan and Hill. The defendants have filed timely objections (dkt. nos. 44, 45), which are now ripe for review.

**II.**

The Court reviews de novo any portions of a magistrate judge's R&R to which a specific objection is made, 28 U.S.C. § 636(b)(1), but may adopt, without explanation, any of the magistrate judge's recommendations to which no objections are filed. Solis v. Malkani, 638 F.3d 269, 274 (4th Cir. 2011) (citing Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983)). In the absence of a timely objection, the Court need "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted). The failure to file specific objections to the magistrate judge's recommendations waives any appellate review of the factual and legal issues presented. Page v.

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); see also Thomas v. Arn, 474 U.S. 140, 150 (1985).

**III.**

In his second motion to suppress, Barker challenges the execution of the arrest warrant, during which police entered his home without a search warrant, his consent, or any exigent circumstances. (Dkt. No. 20). In the R&R filed on May 13, 2013, Magistrate Judge Kaull found that the entry into Barker's home complied with the Fourth Amendment and recommended that the Court deny the motion. (Dkt. No. 34 at 17). Barker objects to the recommendation on the ground that law enforcement officials executing the warrant had no reason to believe he was actually present in his residence when the police executed the warrant. (Dkt. No. 44 at 1).

**A.**

On February 8, 2013, Magistrate Judge Kaull issued a warrant for Barker's arrest for various violations of the terms of his supervised release, including failure to provide his probation officer, Vincent Zummo ("Zummo"), with his current residence. (Case No. 1:04CR86, Dkt. Nos. 114, 115). That same day, while watching the residence at 1103 Phillipi Pike, Clarksburg, West Virginia,

where, according to a confidential informant, Barker was living, Zummo telephoned Deputy United States Marshal Terry Moore ("Moore") to inform him that Judge Kaull had issued a warrant for Barker's arrest. (Dkt. No. 44-1 at 14, 15). At approximately 2:40 P.M. that afternoon (dkt. no. 23-6 at 5), Moore, who is responsible for coordinating teams to execute arrest warrants, id. at 14, assembled a team composed of four deputy United States Marshals, three members of a special multi-jurisdictional drug task force, and the chief probation officer for the area (the "arrest team"). Id. at 15-16. Moore and the arrest team then rendezvoused with Zummo at the house on Phillipi Pike. Id. at 15-16.

Upon arrival, Moore observed a silvery-tan Ford Contour (the "Contour") parked in front of the house. Id. at 16. On January 29, 2013, a white male used the Contour, which was registered to Barker's father, to transport an unnamed passenger to a controlled drug buy conducted by City of Clarksburg Police Officer Robert Root ("Root"), a member of the arrest team and the multi-jurisdictional drug task force. Id. at 48. Although neither Zummo nor Root had contacted Randall Barker to learn if he had loaned the Contour to his son, id. at 66, Lieutenant Brian Purkey had advised Root that he believed Randall Barker was "related to a subject he had investigated in the past," meaning Barker, and that Barker was out

5

of prison and on supervised release. (Dkt. Nos. 23-5 at 1; 44-1 at 65). Based on that information, Root assumed Barker was driving the Contour. (Dkt. No. 44-1 at 65).

With Moore in the lead, the officers approached the house, a two-story structure with three upstairs windows looking out onto the street in front of the house. (Dkt. No. 23-1). Deputy United States Marshal Derek Patrick ("Patrick") announced the team's presence, and stated that they had a warrant for Barker's arrest. (Dkt. No. 23-6 at 5). Nacy Steffich ("Steffich") opened the front door and stated, "Eric lives upstairs." Id. at 5; (Dkt. No. 44-1 at 16). Root, who stood some distance behind Moore, did not hear Steffich's statement, but does recall that she pointed to an interior door that led upstairs when the officers told her they were looking for Barker. (Dkt. No. 44-1 at 51-52). As Moore stood just off the small front porch speaking with Steffich, he observed the curtain in the middle, second-story window "nudged to the side, like somebody was viewing out the window." Id. at 17.

The front door of the house opened into a "common area." Id. Based on Steffich's statements, the officers concluded that Barker lived upstairs through a separate door leading off the common area. Id. at 17, 23. The officers opened that door, and, after Patrick again announced their presence and intent to execute the warrant

6

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

for Barker's arrest, they proceeded up a flight of stairs that led away from the front door to the back of the house to what they assumed was Barker's apartment. Id. at 23.[3] When Patrick reached the top of the stairs, he stepped off on the landing and to the right. Id. at 23. Moore then opened the door directly at the top of the stairs, which opened into a bathroom where he saw Barker, who had around his arm a "homemade tourniquet" of the sort Root associated with intravenous drugs. Id. at 23, 77. Officers also observed a number of needles in plain view on the bathroom sink. (Dkt. No. 23-5 at 2). Upon Moore's order, Barker laid down on the ground and Moore cuffed him. Id. A search of Barker's person revealed $1,300 in cash in his pants pocket. (Dkt. No. 23-6 at 5).

**B.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Undisputably, "searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). Nevertheless, absent a search warrant, law enforcement officials may enter a home to execute an arrest warrant

---

[3]     Apparently, the door opening into the stairwell from the common area was unlocked.

if "there is reason to believe [that the subject of the warrant] is within." <u>United States v. Hill</u>, 649 F.3d 258, 262 (4th Cir. 2011) (quoting <u>Payton</u>, 445 U.S. at 602). Officials must have "(1) reason to believe that the location [to be entered] is the defendant's residence, and (2) . . . a 'reasonable belief' that [the defendant] would be home." <u>Hill</u>, 649 F.3d at 262 (citing <u>United States v. Graham</u>, 553 F.3d 6, 13 (1st Cir. 2009); <u>United States v. Magluta</u>, 44 F.3d 1530, 1535 (11th Cir. 1995).[4] Generally, multiple facts are necessary to support a reason to believe that the subject of the arrest warrant is present at the time of entry. <u>Hill</u>, 649 F.3d. at 264.

Barker objects to the magistrate judge's conclusion that law enforcement officials acted on a reasonable belief that Barker was actually home when they entered his apartment on February 8, 2013, to execute the warrant for his arrest.[5] <u>See</u> <u>Payton</u>, 445 U.S. at 602. He contends that none of the officers had personal knowledge

---

[4]     The requirements of a "reasonable belief" may equate to probable cause, <u>see, e.g.</u> <u>United States v. Hardin</u>, 539 F.3d 404, 416 (6th Cir. 2008), may be negligibly different, <u>see, e.g.</u>, <u>United States v. Barrera</u>, 464 F.3d 496, 501 n. 5 (5th Cir. 2006), or may be something less. <u>See, e.g.</u> <u>United States v. Thomas</u>, 429 F.3d 282, 286 (D.C.Cir. 2005) ("reasonable belief" requires less than probable cause). The Fourth Circuit has left open the question of the relationship between a "reasonable belief" and "probable cause." <u>Hill</u>, 649 F.3d at 263.

[5]     Barker concedes the government has satisfied the first prong of <u>Payton</u>. (Dkt. No. 44 at 2).

## MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATIONS

of the underlying investigation into Barker's supervised release violations, and therefore, they could not have entered his apartment based on a reasonable belief that he was within. (Dkt. No. 44 at 2).

Barker's objections are without merit. Here, a confidential informant had alerted Zummo that Barker, who had failed to advise Zummo of his whereabouts, lived at 1103 Phillipi Pike. See United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995) (confidential informant's report that suspect resided in apartment was a basis for reasonable belief in his presence). The informant did not indicate that Barker shared the residence with anyone. Moreover, the Contour, a vehicle associated with Barker and drug activity, was parked outside. See United States v. Magluta, 44 F.3d 1530, 1538 (11th Cir. 1995) ("The presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect is at home."). Further, after learning from Steffich that Barker "lived upstairs" at that address, Moore observed the curtain in the middle, second-story window "nudged to the side, like somebody was viewing out the window." (Dkt. No. 44-1 at 17); cf. Magluta, 44 F.3d at 1537-38 (that the "lawn was manicured and a porch light was on" indicated that suspect was in his home at the time of entry). Finally, Barker had reported to Zummo that he was unemployed. (Dkt.

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

No. 23-6 at 6). Given Barker's known penchant for drugs, and absent evidence that he was anywhere else, it was not unreasonable for the officers to infer from those facts that he was likely at home when they entered Barker's home in the mid-afternoon. <u>Valdez v. McPheters</u>, 172 F.3d 1220, 1226 (10th Cir. 1999) ("And the officers may consider an absence of evidence the suspect is elsewhere."); <u>Lauter</u>, 57 F.3d at 215 (that suspect was unemployed contributed to reasonable belief that he was in his home).

<u>Allen v. Gillenwater</u>, No. 1:10-CV-359, 2012 WL 3475583 (M.D.N.C. Aug. 15, 2012), on which Barker relies for the proposition that Moore improperly credited the flick of the curtain, is not on all fours with the facts in this case. There, officers had information that Allen lived with his mother. <u>Id.</u> at *9. Upon arriving at the mother's house to execute the arrest warrant, one officer claimed he saw a "porch blind" move, and, on that information, he concluded Allen was within. <u>Id.</u> at *10. After acknowledging that there was a dispute in the record as to whether the officer actually could have seen the blind move from his position, the court concluded that the movement of the blinds "gave no indication that Mr. Allen was within, rather than [his mother] or any other person." <u>Id.</u> at *7.

## MEMORANDUM OPINION AND ORDER
## ADOPTING REPORT AND RECOMMENDATIONS

Unlike Allen, the arrest team in this case had no reason to believe that Barker shared his residence with anyone. Moreover, Moore's testimony – that he observed the curtain in the middle, second-story window "nudged to the side, like somebody was viewing out the window" (dkt. no. 44-1 at 17) – is undisputed. Furthermore, although the court in Allen concluded that the movement of the "blinds may not be indicative of any human activity at all [because] it can be caused by the heating system or a draft or a pet," 2012 WL 3475583 at *7, it strains credulity to assign the movement of the curtains in this case to such an unrelated cause when the movement followed so closely on the heels of Patrick's announcement that the team was there to arrest Barker. Cf. Hill, 649 F.3d at 264 (unresponsive noise emanating from townhouse insufficient basis for reasonable belief as to suspect's actual presence); (Dkt. No. 23-6 at 5). In sum, the arrest team had numerous facts that would lead them reasonably to believe Barker was present in the upstairs apartment at 1103 Phillipi Pike when they arrived to execute the warrant for his arrest.

## IV.

Having determined that the arrest team's entry into Barker's apartment was valid, the Court turns next to Barker's initial

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

---

motion to suppress (dkt. no. 14), which contends that the protective sweep conducted by the arrest team was unsupported by articulable facts that "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 334 (1990). As such, he argues that any evidence seized as a result of that sweep must be suppressed. In his R&R, Magistrate Judge Kaull detailed facts supporting the officers' conclusion that others may have been present within Barker's apartment. (Dkt. No. 34 at 21). Judge Kaull also concluded that the officers' sweep was justified by the confined nature of the stairwell leading to Barker's apartment. Id. Barker objects that these facts are insufficient to justify the protective sweep. (Dkt. No. 44 at 5).

**A.**

Immediately after Moore cuffed Barker and placed him on the ground, members of the arrest team kicked open a locked door that stood one or two feet to the left of the door that opened into the bathroom where Moore found Barker. Id. at 23-24. The locked door opened into a bedroom. When Moore and Patrick entered that room, they discovered Dunigan, also a federal supervisee, hiding behind

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

a bed. (Dkt. No. 44-1 at 25). They also observed pills in plain view on the bedroom dresser. Id. at 25.

As Moore and Patrick were in the process of locating Dunigan in the bedroom to the left of the bathroom where Barker had been found, Root remained in the hallway. From that vantage point, he was able to see through an open door into the kitchen, where he observed what he believed to be packaging for synthetic marijuana sitting out on the table in plain view. Id. at 30. Root quickly proceeded down the hallway toward the front of the house to "secure those rooms for [sic] any other threats." Id. at 52. There, he discovered Hill, another federal supervisee. (Dkt. No. 44-1 at 79). After arresting Hill, Root observed drug paraphernalia on a dresser. Id. at 79, 80. Root led Hill out into the hallway and placed him against the wall. Id. at 80.

Because Barker's apartment was so small, the arrest team's sweep took, at most, two minutes. (Dkt. No. 44-1 at 25). At the Franks hearing conducted by the magistrate judge, Moore described the landing and the staircase leading to it as a "very unprotected area." Id. at 26. He stated:

> [O]nce you went up the stairs, you were completely
> exposed by any room in that house. The top of the stairs
> was — it was level, but it was a rail, just a protective
> rail to keep, like somebody from falling down. So, you
> were able to see through it. It was just a normal sized

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

> hallway, four feet across. It was about the length of the
> stairway, probably [twenty (20)] feet, something like
> that. But once you were in the stairway, you were pretty
> much open from every room.

Id. at 26. Root confirmed that all of the rooms were "very close in
proximity to each other." Id. at 53. In fact, each room in the
house – the back bedroom where Dunigan was hiding, the bathroom,
the kitchen, the front bedroom where Hill was found, and the living
room – radiated off the same central hallway. (Dkt. Nos. 44-1 at
22; 23-4).

**B.**

"[A]s an incident to arrest . . ., as a precautionary matter
and without probable cause or reasonable suspicion, [officers may]
look in closets and other spaces immediately adjoining the place of
arrest from which an attack could be immediately launched."
Maryland v. Buie, 494 U.S. 325, 334 (1990). Otherwise, to sweep
beyond those spaces immediately adjoining the place of arrest,
"there must be articulable facts which, taken together with the
rational inferences from those facts, would warrant a reasonably
prudent officer in believing that the area to be swept harbors an
individual posing a danger to those on the arrest scene." Id. at
334.

MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATIONS

In either case, a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found . . . [and] no longer than is necessary to dispel the reasonable suspicion of danger and . . . no longer than it takes to complete the arrest and depart the premises." Id. at 335. The Fourth Circuit recently noted that the "linchpin of the protective sweep analysis is not 'the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.'" United States v. Jones, 667 F.3d 477, 484 (quoting Buie, 494 U.S. at 336); see also Mora v. City of Gaithersburg, 519 F.3d 216, 226 (4th Cir. 2008) (upholding a preventive search when officers "did not and could not fully know the dimensions of the threat they face").

In the context of the first type of sweep permissible under Buie, officers may, without probable cause, view "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334. The Fourth Amendment permits this limited incursion into the arrestee's home because "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Buie, 494 U.S. at 333

15

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATIONS

(reasoning that with respect to the defendant and the basement from which he ascended, "the police don't know how many other people are down there").

Here, Barker's apartment was small (dkt. no. 44-1 at 25), such that "everything was so close together that a threat could have been in any one of [the] rooms." Id. at 43. It was described as having all its rooms in "close proximity to each other." Id. at 53. After entering the front door to the apartment, the only way to proceed was up a flight of stairs to a landing. Id. at 24. At the top of the landing, there was a closed bathroom door directly ahead, a locked bedroom door to the left, an open living room and kitchen area to the right and, running parallel to the open stairwell, an open hallway leading to another bedroom. Id. The hallway was about four feet wide and twenty feet long with a protective railing as the only barrier between it and the stairway. Id. at 26.

In sum, the apartment was small enough that each room the officers entered subsequent to Barker's arrest can reasonably be termed "immediately adjoining." See United States v. Alejandro, 100 F. Appx. 846, 847 (2nd Cir. 2004) (reasoning that "[p]articularly when a district court finds that an apartment is small, an immediately adjoining room is searchable under the 'protective

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

sweep' exception."); <u>United States v. Davis</u>, 906 F. Supp. 2d 545
(S.D. W. Va. 2012) (holding that where a defendant was arrested at
the center point of a "very small [home], consisting of a
single-story four-square floor plan with a small bathroom and
interior hallway," a protective sweep of the entire space was
proper considering "a person could traverse the entire width or
length of Defendant's house in seconds with just a few quick
strides").

Moreover, the two bedrooms and living room radiated off from
the central landing in Barker's apartment, the place of Barker's
arrest. The bedroom door behind which Dunigan was found was just "a
step" away from the spot where Barker was handcuffed. (Dkt. No. 44-
1 at 24). The bedroom in which Hill was hiding also faced the
landing where Barker was arrested. <u>Id.</u> at 26. In fact, it
overlooked the backs of the arrest team, who were lined up on the
stairs with nothing but a protective railing between the closed
door and the arrest team. <u>Id.</u> Once the arrest team was in the
stairway, they were "pretty much open from every room." <u>Id.</u> The
space was small, <u>id.</u> at 25, and very unprotected. <u>Id.</u> at 26.
Considering both the size of the apartment and the openness of the
area where Barker was arrested, the arrest team was permitted to do
a protective sweep of the bedrooms where Dunigan and Hill were

## MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATIONS
---

found. See United States v. Lay, 182 F.3d 911, *2 (4th Cir. 1999) (unpublished) (where an arrest occurred within and subsequently a protective sweep was done on an entire "small apartment where effectively every room adjoin[ed] every other room," and evidence obtained from a bedroom adjoining the living room, the place of arrest, was not suppressed).[6]

Furthermore, the fact that the bedroom door to the left was locked, (dkt. no. 44-1 at 32), made it no less a space immediately adjoining the place of arrest from which an attack could be launched. See United States v. Burrows, 48 F.3d 1011, 1017 (7th Cir. 1995) (reasoning that a protective sweep could include "the search of the four bedrooms and linen closet, which required the officers to force four locked doors, [and] took no more than five

---

[6]    Other courts have also concluded that the size of a building in which an arrest occurs bears on whether rooms within that building immediately adjoin one another. See, e.g., United States v. Thomas, 429 F.3d 282, 287 (D.C. Cir. 2005); In re Sealed Case 96-3167, 153 F.3d 759, 770 (D.C. Cir. 1998) (entrance into a small bedroom that "was only a few feet from the larger bedroom door and only a few feet from the top of the stairs," and "was a space from which an attack could be immediately launched" was a proper protective sweep); United States v. Sunkett, 95 F. Supp. 2d 1367, 1368 (N.D. Ga. 2000) (validating the protective sweep of a bedroom off a hallway with a direct line of sight from the bedroom to the front door where the arrest took place); United States v. Mayo, 792 F. Supp. 768, 773-74 (M.D. Ala. 1992) ("[t]he bedroom doorway which adjoined the living room . . . falls within the Buie definition of a 'space immediately adjoining the place of arrest from which an attack could be launched'").

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

minutes "); <u>United States v. Robinson</u>, 775 F. Supp. 231, 231 (N.D. Ill. 1991) (the protective sweep of a locked bedroom was permissible, given that the bedroom was a space "immediately adjoining the place of arrest from which an attack could be immediately launched").

Additionally, even if Barker's apartment were not so small or the rooms so clearly oriented into the hallway where Barker was arrested, the arrest team's sweep of Barker's apartment was permissible because "articulable facts [warranted] a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." <u>Buie</u>, 494 U.S. at 334. Notably, the "linchpin of the protective sweep analysis is not 'the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.'" <u>United States v. Jones</u>, 667 F.3d 477, 484 (quoting <u>Buie</u>, 494 U.S. at 336). Nonetheless, "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." <u>United States v. Colbert</u>, 76 F.3d 773, 778 (6th Cir. 1996).

Here, the arrest team had articulable facts to support the necessity of a further protective sweep. First, the arrest team saw curtains move at the front of the apartment. (Dkt. No. 44-1 at 17). Barker, the only person believed to be in the apartment, was found

in a bathroom at the back of the apartment with a tourniquet around his arm. Id. at 76-77. Based on Barker's location at the time of his arrest, the officers could have rationally inferred that Barker was not the individual who moved the curtains, and that another person was hidden in the apartment.

Second, the bedroom door adjacent to the arrest was locked. Id. at 32. If Barker was the only person in the apartment, as the arrest team believed, it was reasonable to ask why he would have locked that door. Based on the premise that Barker was the only person in the apartment, the arrest team rationally could have inferred from the locked door that the apartment harbored a person in addition to Barker. Cf. United States v. Davis, 471 F.3d 938, 4945 (8th Cir. 2006) (holding that officer exceeded bounds of Buie by forcing open locked closet door where "nothing he observed indicated that anyone was hiding in the closet"). In sum, because the arrest team swept spaces immediately adjoining the site of Barker's arrest, and because articulable facts supported the officers' conclusion that the apartment may have harbored another individual who posed a threat to them, the protective sweep of Barker's apartment did not exceed the bounds of Buie.

**V.**

MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATIONS

The Court turns next to Barker's contention that the dog sniff conducted inside the apartment subsequent to his arrest constituted a warrantless search, (dkt. no. 14 at 4), and evidence discovered pursuant to any dog sniff is tainted and must be suppressed. Id.

Magistrate Judge Kaull concluded that Barker, a convicted felon serving a term of supervised release, had a significantly diminished privacy interest that did not outweigh the government's interest in discovering the criminal activity of its supervisees. See (Dkt. No. 34 at 22-23) (citing United States v. Knights, 534 U.S. 112, 120-21 (2001)). Alternatively, he concluded that, despite the Supreme Court's recent decision in Florida v. Jardines, — S.Ct. —, 2013 WL 1196577 (2013), the officers' actions complied with then-binding appellate authority, see United States v. Jeffus, 22 F.3d 554 (4th Cir. 1994), and therefore did not merit application of the exclusionary rule. (Dkt. No. 44 at 23-24). Barker argues that, under the specific conditions of his supervised release, he did not consent to a warrantless search of his home and thus maintained the expectation of privacy afforded to someone who is not subject to the restrictions attendant to supervised release. (Dkt. No. 44 at 6-7). Barker also disputes that Jeffus is binding appellate precedent that would justify application of the good faith exception in Davis. Id. at 8.

## MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATIONS

**A.**

After Barker, Dunigan, and Hill were secured, Zummo entered the apartment and identified them as individuals on federal supervised release. (Dkt. No. 23-5 at 2). Arrest team members conducted a "quick walk-through" of the apartment for drugs or drug paraphernalia that would constitute violations of the trio's supervised release. Id. at 81. In addition to the contraband already observed in the bathroom, bedrooms, and kitchen, and the cash found in Barker's pocket, Root and other members of the arrest team observed items related to drug distribution – waxed paper, black electrical tape, and scales – on the coffee table in the living room. (Dkt. No. 44-1 at 54, 70).

Zummo asked Root to summon a narcotics police dog and handler to walk through the apartment. Id.; (Dkt. No. 44-1 at 55, 80). Root did so, and approximately fifteen minutes later, "Quincy," a certified police canine, and his handler arrived and performed a "free air" sniff of Barker's apartment. (Dkt. No. 23-5 at 2). Quincy alerted "high" to an odor in the bathroom area. Id. Following that alert, a member of the arrest team noticed a ceiling tile out of place, on top of which he could see a plastic baggie. Id.; (Dkt. No. 44-1 at 72). At that point, the arrest team secured

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

the apartment and Root contacted the United States Attorney to apply for a search warrant. Id.; (Dkt. No. 44-1 at 55).

**B.**

Citing to no authority, Barker broadly objects that Zummo and the arrest team lacked legal authority to search his apartment following his arrest. (Dkt. No. 44 at 6). He contends that Knights, the case on which the magistrate judge relied, is inapposite because he never consented to a warrantless police search when he agreed to the particular terms of his supervised release. Id.

**1.**

"The touchstone of the Fourth Amendment inquiry is one of simple reasonableness." United States v. Bumpers, 705 F.3d 168, 171 (4th Cir. 2013) (citing Pennsylvania v. Mims, 434 U.S. 106, 108-09 (1977) (per curiam)); see also Knights, 534 U.S. at 118. To assess whether a search is reasonable, a court balances "the degree to which it intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 119 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)).

In Knights, a unanimous Supreme Court held that only a "reasonable suspicion and authoriz[ation] by a condition of

probation" are necessary to render the warrantless search of a probationer's home reasonable. <u>Knights</u>, 534 U.S. at 122. An individual's status as a probationer "'informs both sides of that balance.'" <u>United States v. Brown</u>, 346 F.3d 808, 811 (8th Cir. 2003) (quoting <u>Knights</u>, 534 U.S. at 119). On the one hand, a probationer such as Barker does "not enjoy the absolute liberty to which every citizen is entitled." <u>Knights</u>, 534 at 119 (internal quotations omitted). On the other hand, the government legitimately needs more power to search probationers because "'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" <u>Knights</u>, 534 U.S. at 120 (citing <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 880 (1987)). A search condition included in the terms of supervised release is a "salient circumstance," <u>id.</u> at 118, that affects the balance. <u>United States v. Carnes</u>, 309 F.3d 950, 961 (6th Cir. 2002).

The major difference between this case and <u>Knights</u> is that Barker's conditions of supervised release contain a narrower search provision than the one considered by the Supreme Court in <u>Knights</u>. There, the probationer agreed to "'[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or

reasonable cause by any probation officer or law enforcement officer.'" Knights, 534 U.S. at 114. In this case, Barker agreed to "permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband in plain view of the probation officer." See (Case No. 1:04CR86-2, Dkt. No. 114). Thus, the lone question presented by Barker's objection is whether the particular language of his search provision "upsets the Knights balancing test so as to require more than a reasonable suspicion to justify" a warrantless search[7] of Barker's home. United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005).

The Court concludes that it does not. As a probationer, Barker's reasonable expectation of privacy falls well below that of a non-probationer, regardless of the language of his search condition. Knights, 534 U.S. at 119 ("probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting Griffin, 483 U.S. at 874)); United States v. Pickens, 295 F. App'x 556, 557 (4th Cir. 2008) ("individuals under supervision have diminished rights under the Fourth Amendment"); United States v. Wilson, 105 F. App'x 498, 499 (4th Cir. 2004) ("A parolee has

---

[7]     For the purposes of this analysis, the Court assumes without deciding that the officers' walk-through of Barker's apartment after securing Barker, Hill, and Dunnigan, and Quinn's free-air sniff, are searches for Fourth Amendment purposes.

diminished rights under the Fourth Amendment."); Brown, 346 F.3d at 811 ("And when a probationer consents to a search condition, his already-reduced reasonable expectation of privacy diminishes significantly.") (citing Knights, 534 U.S. at 120); United States v. Reyes, 283 F.3d 446, 458 (2d Cir. 2002) (the rule that "among the rights diminished by parolee status [are] Fourth Amendment protections" is applicable to probationers) (emphasis in original) (internal citations and quotations omitted).

While the particular language of Barker's search provision undoubtedly is narrower than the one considered in Knights, it nevertheless makes clear that Barker could not refuse a visit from the probation officer and that he could not prevent confiscation of any contraband within plain view. See (Case No. 1:04CR86-2, Dkt. No. 114) (Barker "shall permit" probation officers to visit him at any time; he "shall permit" probation officers to confiscate contraband in plain view). Barker's acquiescence to that search provision "in and of itself, indicates that he knew that his expectation of privacy was diminished by virtue of his status as a convicted person serving a term of supervised release." Reyes, 283 F.3d at 460 (describing impact of identical search provision on probationer's reasonable expectation of privacy); see also Wilson, 105 F. App'x 498, 500 (4th Cir. 2004) (because probationer

consented to "home visits," "he was aware that his expectation of privacy was diminished by virtue of his parolee status") (citing Reyes, 283 F.3d at 460-61)); United States v. Keith, 375 F.3d 346, 350 (5th Cir. 2004) (where probationer was aware that his reasonable expectations of privacy were diminished due to his status, court would not require more than reasonable suspicion to sustain warrantless search). But see United States v. Carnes, 309 F.3d 950, 963 (6th Cir. 2002) (requiring probable cause to search parolee's home where nothing in his parole agreement "shows that he would expect the police to be able to search him without probable cause or a warrant").

Barker's particular factual situation further diminishes his reasonable expectation of privacy beyond even that of a similarly situated probationer subject to the same search condition. The Court previously had revoked Barker's supervision because of his failure to appear for a drug test, admitted use of opiates without a prescription, and association with convicted felons. (Case No. 1:04CR86-2, Dkt. No. 94). After completion of his revocation sentence on November 29, 2012, Barker should have reasonably concluded that probation would closely monitor his activities. See Yuknavich, 419 F.3d at 1310 (probationer's violation of the terms of supervision merits close monitoring by probation officers).

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

Moreover, by continuing to engage in the same activities that resulted in his first revocation – admitted drug use, failing to report for drug testing, and moving his residence to 1103 Phillipi Pike without informing Zummo, see (case no. 1:04CR86-2, dkt. no. 114) – Barker's reasonable expectation of privacy fell even lower. See id. (pedophile who continued to associate with children and downloaded child pornography while on supervised release would "not expect his probation officer to see red flags everywhere is inconceivable").

As noted above, Barker's status as a probationer "informs both sides of the equation." Brown, 346 F.3d at 811 (quoting Knights, 534 U.S. at 119). Logically, any diminution in his reasonable expectation of privacy due to his actions while on probation should accrue to the government's interest in searching him. Thus, Barker's continued violations strengthened the "government's [already] considerable interest in supervising probationers." Yuknavich, 419 F.3d at 1309; see Knights, 534 U.S. at 112 ("'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law'") (citing Griffin, 483 U.S. at 880)); United States v. Graham, 553 F.3d 6, 18 (1st Cir. 2009) ("government has a

significant interest in monitoring probationers, given their proclivity to both commit and cover up crimes").

In sum, even assuming the particular search provision at issue here marginally increased his reasonable expectation of privacy, Barker's privacy interest does not outweigh the government's considerable need to oversee the behavior of a supervisee such as Barker, who appeared intent on violating the conditions of his supervised release. Accordingly, the Court concludes that Zummo and the arrest team needed only a reasonable suspicion, and not probable cause or a warrant, to search Barker's apartment. See Knights, 534 U.S. at 122; Yuknavich, 419 F.3d at 1309; Wilson, 105 F. App'x at 500 ("Given the circumstances of Wilson's parole, we find that the officers needed only, at most, reasonable suspicion to conduct a walk-though of Wilson's home under Knights.")

Only one question remains – whether Zummo and the arrest team had a reasonable suspicion that Barker was engaged in criminal activity when they performed a walk-through and caused Quinn the drug dog to perform an open-air sniff of the apartment subsequent to Barker's arrest. "Reasonable suspicion determinations are based on the totality of the circumstances in light of the officers' experience and specialized training." Wilson, 105 F. App'x at 500 (citing United States v. Arvizu, 534 U.S. 266, 273-74 (2002)).

## MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATIONS

"Although the reasonable suspicion standard defies precise definition, it is less demanding than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." <u>United States v. Griffin</u>, 589 F.3d 148, 152 (4th Cir. 2009) (internal citations and quotations omitted).

Clearly, Zummo and the arrest team had good cause to suspect criminal activity was afoot in Barker's apartment. Fundamentally, they had legally entered Barker's apartment to execute a warrant for his arrest for violations of his supervised release. <u>See</u> (Case No. 1:04CR86-2, Dkt. No. 114). Once inside the apartment, they discovered Barker in his bathroom with a tourniquet around his arm and hypodermic needles on the back of the sink, facts strongly suggestive of intravenous drug use. When Moore and Patrick swept the bedroom to the left of the bathroom, they discovered Dunigan, also on federal supervised release, and pills in plain view. (Dkt. No. 44-1 at 25). Root observed what he believed to be packaging for synthetic marijuana sitting out on the kitchen table, <u>id.</u> at 30, and drug paraphernalia on the dresser in the room where Hill was found during the protective sweep prior to his arrest. <u>Id.</u> at 79, 80.

Viewed together, those facts, and all rational inferences drawn from them, clearly indicate that Zummo and the arrest team

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

had a reasonable suspicion that Barker was engaged in criminal activity when they walked through the apartment after his arrest and summoned the drug dog to Barker's apartment. Thus, assuming without deciding that those actions, the walk-through and the open-air sniff performed by the dog, were indeed searches, they were supported by a reasonable suspicion of criminal activity and did not, therefore, violate Barker's Fourth Amendment rights.[8]

## VI.

Even assuming <u>arguendo</u> that the arrest team's actions after arresting Barker – conducting a walk-through of the apartment to look for contraband and causing a dog-sniff to be performed – were unreasonable searches that violated the Fourth Amendment, and their fruits should be excluded, the Court concludes that the warrant to search Barker's apartment, which the arrest team later obtained, was still supported by probable cause. See <u>United States v. Karo</u>, 468 U.S. 705, 719 (1984) ("[I]f sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid"); <u>United States v. Allen</u>, 631 F.3d

---

[8]     Because the Court considers Barker's status as a supervisee dispositive on the issue of the validity of the arrest team's actions after Barker's arrest, it is unnecessary to address Barker's objections to the magistrate judge's application of the good faith exception of <u>Davis v. United States</u>, 131 S. Ct. 2419 (2011).

164, 173 (4th Cir. 2011) (same); <u>United States v. Gillenwaters</u>, 890

F.2d 679, 681 (4th Cir. 1989) (same).

<u>United States v. Allen</u> is instructive on this point. 631 F.3d

at 173. There, after a street shooting, a police detective followed

a trail of blood from the crime scene to a building owned by Allen,

and, finally, to a filing cabinet inside. <u>Id.</u> at 167. One of the

cabinet doors was slightly ajar. <u>Id.</u> The detective opened it and

discovered a silver revolver. <u>Id.</u> Subsequently, based in part on

the revolver, the detective obtained a warrant to search Allen's

building. <u>Id.</u> at 168. Allen argued the revolver and the fruits of

the search authorized by the subsequently obtained warrant should

be suppressed because the opening of the cabinet door and

observation of the silver revolver constituted an illegal search.

<u>Id.</u>

The Fourth Circuit disagreed. Proceeding on the assumption

that the "search" that had yielded the revolver violated the Fourth

Amendment, the court concluded that "evidence seized under the

[subsequently obtained warrant] need not be suppressed, because

'sufficient untainted evidence was presented in the [supporting]

affidavit to establish probable cause,' rendering the warrant

valid." <u>Id.</u> at 173 (citing <u>Karo</u>, 468 U.S. at 719).

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

The Fourth Circuit has reached similar conclusions in numerous
other cases.[9] See <u>United States v. Sellers</u>, Nos. 10-4701, 10-4702,
10-4917, 2013 WL 749512, at *7 (4th Cir. 2013)  cert. denied, No.
12-10118, 2013 WL 1888646 (June 3, 2013); <u>United States v. Moses</u>,
540 F.3d 263, 271 (4th Cir. 2008); <u>United States v. Christian</u>, 1
F.3d 1234, *3 n.2 (4th Cir. 1993) ("Even if the affiant's
representation was made in bad faith the appropriate remedy is
excision of the false information."); <u>Gillenwaters</u>, 890 F.2d at
681.

In this case, as in <u>Allen</u>, and as the magistrate judge
properly concluded, once excised of any (arguably) improperly
obtained information, the warrant to search Barker's apartment is
still supported by probable cause. "[P]robable cause plainly

---

[9]      Barker attempts to distinguish the <u>Allen</u>/<u>Gillenwaters</u> line of
cases by stating that "[<u>Allen</u>] involves a <u>Franks</u> claim. It is in the
context of <u>Franks</u> that redaction is allowed." (Dkt. No. 44 at 10)
(referencing <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978)). That is
not accurate. In <u>Franks</u>, the Court held that "an accused is entitled to
a [] hearing on the veracity of statements in the affidavit . . . [if he]
make[s] a substantial preliminary showing that false statements were
either knowingly or recklessly included in the affidavit supporting a
search warrant **and** that, without those false statements, the affidavit
cannot support a probable cause finding." <u>Allen</u>, 631 F.3d at 171 (citing
<u>Franks</u>, 438 U.S. at 155-56 (emphasis in original)). While the rule
applied here, which was announced by the Court in <u>Karo</u>, and repeated by
the Fourth Circuit in <u>Gillenwaters</u> and <u>Allen</u>, draws upon the rule of
<u>Franks</u>, see <u>Karo</u>, 468 U.S. at 719 (citing <u>Franks</u>, 438 U.S. at 172), that
connection does not limit redaction of improperly obtained information
from a warrant to the <u>Franks</u> context, alone.

## MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATIONS

'exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" <u>Allen</u>, 631 F.3d at 172 (citing <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996)).

Here, paragraph 4 of the Affidavit for Search Warrant states that officers had observed drug paraphernalia, including pills, hypodermic needles, and a homemade tourniquet, in plain view in the rooms where Barker, Dunigan, and Hill were located. (Dkt. No. 23-6 at 5). The affidavit also reports that Barker was discovered with $1,300 cash in his pants pocket, although he had told Officer Zummo he was unemployed. <u>Id.</u> at 5-6. When these facts are considered in conjunction with the drug paraphernalia found scattered throughout the apartment, a judicial officer of reasonable prudence would conclude that the apartment would likely harbor additional contraband, illegal drugs, and evidence of the crime of drug distribution. <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). Therefore, even after excising the evidence that Barker argues was improperly obtained, the affidavit contains

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATIONS**

sufficient untainted information to establish probable cause for
the issuance of the warrant. The subsequent search of Barker's
apartment was not therefore invalid, and its fruits need not be
suppressed.

**V.**

In conclusion, for the reasons discussed, the Court:

1.    **ADOPTS** the magistrate judge's R&R (dkt. no. 34);

2.    **DENIES** Barker's first and second motions to suppress (dkt.
      nos. 14 and 20);

3.    **DENIES** Dunigan's motion to suppress (dkt. no. 16); and

4.    **DENIES** Hill's motion to suppress (dkt. no. 18).

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Order
to counsel of record and all appropriate agencies.

DATED:    June 26, 2013

_____
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE